IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 22-130-BLG-SPW |
| Plaintiff, | |
| vs. | ORDER |
| ROBERT EARL BIGGS, | |
| Defendant. | |

Before the Court is Defendant Robert Earl Biggs's Motion to Suppress. (Doc. 39). Biggs seeks to suppress statements he made to police about the presence of drugs in his hotel room and evidence seized by police during four warrantless "searches" of the room. (Doc. 40). Biggs argues the statements must be suppressed because his arrest in his hotel room violated the Fourth Amendment, and officers' subsequent questioning violated the Fifth Amendment. As to the evidence seized by police during the allegedly warrantless searches, Biggs argues it must be suppressed because the alleged searches also violated the Fourth Amendment. Lastly, Biggs asks the Court to suppress the evidence police later seized from the room pursuant to a search warrant—notably, the drugs and a firearm—because, without the evidence collected in violation of the Fourth and Fifth Amendments, the search warrant lacks probable cause.

1

The United States opposes the motion.  (Doc. 44).  Biggs filed a reply (Doc. 45), however because it was a week late, the Court will not consider it.  D. Mont. L.R. 47.2(a), (b).

Biggs requested a hearing.  An evidentiary hearing was held on August 14, 2023. Billings Police Detective Steve Hallam and Officer Tyrel Flammang testified.  The Court finds that the majority of the material facts are not disputed and are clearly and accurately recorded on Detective Hallam's body camera footage.

For the following reasons, the Court denies Biggs's motion.

## I.    Factual Background[1]

On July 11, 2022, Billings Police Officer Flammang received information from an informant[2] that Brandi Davitt and other women were selling drugs for a man who had traveled from Great Falls to Billings with a couple pounds of methamphetamine and thousands of fentanyl pills.  (Doc. 42-1 at 9).  The informant said the man had gotten a hotel in the Billings area.  (*Id.*).  Davitt is known to law enforcement as involved in dealing and possession of drugs, as well as prostitution.  (*Id.* at 1).

---

[1] The facts are based on the parties' briefing (Docs. 40, 44); the search warrant and Detective Hallam's and Officer Flammang's police reports (Doc. 42-1); and footage from Detective Hallam's body camera (Doc. 43).

[2] Officer Flammang described the informant as a "tried and proven reliable source."  (Doc. 42-1 at 9).  The parties do not dispute the reliability of the informant.

The same day, officers pulled over a Ford Explorer with no front license plate on Laurel Road. (*Id.* at 9). Davitt was driving and consented to a search of the vehicle. (*Id.* at 9-10). Officers found suspected methamphetamine, fentanyl pills, and multiple jars, baggies, and a scale, often used for resale of drugs. (*Id.* at 10). Davitt, having been read her *Miranda* rights, told Detective Hallam that a black man named Robert Biggs was in Billings from Great Falls and, a couple days prior, had four to five pounds of methamphetamine and 4,000 fentanyl pills in his hotel room. (*Id.* at 1-3). She stated Biggs was staying at the Econo Lodge, 5425 Midland Road, in room 119, and driving a white Chevrolet Tahoe. (*Id.* at 1, 3, 10). After speaking with Davitt, Detective Hallam confirmed with the Econo Lodge clerk that a man named Robert Biggs was staying in room 119, and that a white Tahoe was listed on the room reservation. (*Id.* at 4, 10).

Officers stationed at the Econo Lodge saw a white Tahoe parked in front of room 119 and contacted the driver, Leota Beartusk. (*Id.* at 10). Detective Hallam knows Beartusk to be a methamphetamine user who has been implicated in past drug investigations. (*Id.* at 4). Beartusk said the Tahoe belonged to Biggs but denied knowing if he was in the room or if he was selling drugs. (*Id.* at 10; Doc. 43 at 1:59). She consented to a search of her purse and the Tahoe. (Doc. 42-1 at 10; Doc. 43 at 14:09-13). Officers found in her purse about 200-300 fentanyl pills and numerous individually packed baggies containing suspected methamphetamine

3

for resale. (Doc. 42-1 at 10). Beartusk said the drugs were from a third party named "Mumbles."

Shortly after Detective Hallam began searching the Tahoe, an officer watching over Beartusk yelled out that a man matching Biggs's description had opened the outside door to room 119, saw the officers, and retreated inside. (*Id.* at 4, 10). Detective Hallam, concerned that Biggs would destroy evidence, obtained a master key from the hotel clerk and opened the door to room 119. (*Id.* at 4; Doc. 43 at 27:29-52). Biggs was standing in the door threshold. (Doc. 43 at 27:52). Detective Hallam ordered him out of the room and to the ground. (*Id.* at 27:52-59). Detective Hallam directed another officer to clear the room. (*Id.* at 28:01-05). The officer entered the room, removed a female, identified as Nikki McClusky, and handcuffed her. (*Id.* at 28:05-12). Detective Hallam then entered the room with his gun drawn, and looked in the area between the bed and the bathroom not visible from the entry way, on the far side of the bed, and quickly toward the bathroom. (*Id.* at 28:17-33). He did not enter the bathroom. He then partially re-entered the room to prop open the door with two pairs of shoes. (*Id.* at 28:36-46).

Detective Hallam *Mirandized* Biggs while Officer Flammang handcuffed him. (*Id.* at 28:50-29:12). Biggs responded, "I do," when Detective Hallam asked if Biggs understood the rights read to him, and "yes sir" when asked if he wished to cooperate with officers. (*Id.* at 29:12; 29:38).

4

Detective Hallam then spoke with McClusky.  He explained that if she had

no wants or warrants, she was free to go.  (*Id.* at 30:07-15).  He then asked if she

had anything in the room, to which she responded that she had a small bag on the

table.  Detective Hallam entered the room to retrieve the bag, which was on the

bed.  (*Id.* at 30:23-50).  McClusky consented to a search of the bag, which did not

contain any illegal items.  (*Id.* at 31:00-32:06).  Officers removed her handcuffs,

and McClusky asked if she could get her cup and $10 from the room.  (*Id.* at

32:10-51).  Detective Hallam re-entered the room, grabbed the cup and a shooter of

Fireball, and gave them to McClusky.  (*Id.* at 32:52-33:11).  She left.

Officer Flammang began drafting a search warrant application while

Detective Hallam explained to Biggs the basis for the drug investigation and asked

him what was in the room.  (*Id.* at 33:51-34:56).  Biggs stated he brought "a couple

ounces" of methamphetamine and about 20 fentanyl pills to Billings.  (*Id.* at 36:27-

35).  He also said that a firearm was on the table and that he was a convicted felon.

(*Id.* at 37:25-51).

Biggs then asked Detective Hallam to speak in private.  (*Id.* at 28:25-27).

Biggs and Detective Hallam entered room 119, and Biggs sat on the bed.  (*Id.* at

38:42-50).  Detective Hallam asked Biggs again if he understood his rights, to

which Biggs said, "I do." (*Id.* at 38:54-57).  Biggs said he did not want this "to

backfire on him" and asked Detective Hallam what he wanted from him.  (*Id.* at

39:00-07).  He then inquired, "what about an attorney – would an attorney be

better?"  (*Id.* at 39:08-11).  Detective Hallam responded that Biggs had the right to

an attorney and that if he wanted one, Detective Hallam would need to stop asking

questions until one arrived.  (*Id.* at 39:12-39:38).  Biggs then said, "Please make it

understandable."  (*Id.* at 39:39-43).  Before Detective Hallam could substantively

respond, Biggs recited his understanding of his right to remain silent, which, he

said, "means everything I tell you can be used against me."  (*Id.* at 39:41-53).

Detective Hallam then said, "honesty goes a long way in the court's eyes" and

provided Biggs with the information officers had gathered to that point.  (*Id.* at

39:54-42:10).  Biggs eventually admitted that a pound and a half of

methamphetamine and an unknown amount of pills were under the bed.  (*Id.* at

43:34).

 Thirteenth Judicial District Court Judge Ashley Harada granted Officer

Flammang's search warrant application for the hotel room.  Officers found a 9 mm

pistol, nine live rounds of ammunition, about 24.4 ounces of methamphetamine,

about 2.1 ounces of fentanyl pills, about $9,000 in cash, and other drug

paraphernalia.  (Doc. 42-1 at 18).  Biggs was charged with conspiracy to possess

with the intent to distribute controlled substances in violation of 21 U.S.C. § 846,

possession with intent to distribute controlled substances in violation of 21 U.S.C.

§ 846(a)(1) and 18 U.S.C. § 2, and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i).  (Doc. 1).

## II.    Discussion

Biggs argues that his Constitutional rights were violated and the Court should grant his suppression motion because: (1) officers' warrantless seizure of Biggs from his hotel room violated his Fourth Amendment right to be free from unreasonable seizures; (2) officers' failure to obtain from Biggs a valid waiver of his *Miranda* rights before they questioned him violated the Fifth Amendment; (3) officers' failure to stop interrogating Biggs after he invoked his right to an attorney violated the Fifth Amendment; and (4) the officers' warrantless "searches" of Biggs's hotel room after his arrest violated his Fourth Amendment right to be free from unreasonable searches.  (Doc. 40).  Biggs argues that since these actions constituted illegal seizures and searches, and no exigent circumstances justified them, the Court should suppress Biggs's statements about the drugs in his room. (*Id*. at 24-26).  Without such evidence, the search warrant was deficient, and the evidence seized from Biggs's hotel room should be suppressed.  (*Id*.).

The Court will address each alleged constitutional violation in turn.

*A.    Warrantless Seizure of Biggs*

7

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "The Fourth Amendment protection against unreasonable searches and seizures is not limited to one's home, but also extends to such places as hotel or motel rooms." *United States v. Cormier*, 220 F.3d 1103, 1108-09 (9th Cir. 2000). Thus, a person's reasonable expectation of privacy in a hotel room exists until the rental period ends or is terminated by the hotel. *United States v. Bautista*, 362 F.3d 584, 590 (9th Cir. 2004).

If officers seize a person in or search their hotel room, they must have a warrant, unless exigent circumstances exist that "make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (internal citations and quotations omitted). "Preventing the imminent destruction of evidence is one such exigency." *United States v. Iwai*, 930 F.3d 1141, 1144 (9th Cir. 2019). This exigency exists when "'officers, acting on probable cause and in good faith, reasonably believe from the totality of the circumstances that [ ] evidence or contraband will imminently be destroyed[.]'" *United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002) (per curiam) (quoting *United States v. Kunkler*, 679 F.2d 187, 191-92 (9th Cir. 1982)).

For instance, in *United States v. McLaughlin*, the Ninth Circuit found that exigencies existed to justify officers' entry into the defendant's home because the arrest of a person who police saw dropping a package of marijuana at the defendant's house made it "more likely that those in the [defendant's] residence would discover that they were under surveillance" and lead them to destroy evidence. 525 F.2d 517, 521 (9th Cir. 1975).

"Probable cause means only a 'fair probability,' not certainty, and requires consideration of the totality of the circumstances." *United States v. Hill*, 459 F.3d 966, 970 (9th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Accordingly, to satisfy the probable cause requirement, there must be a fair probability that contraband or evidence of a crime will be found in a particular place. *United States v. Needham*, 718 F.3d 1190, 1194 (9th Cir. 2013). Police may rely on information received through an informant, "rather than [their] direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." *Gates*, 462 U.S. at 242. *See also McLaughlin*, 525 F.2d at 521 (probable cause existed because information from a reliable informant was corroborated by police surveillance). The Government bears the burden of showing the specific and articulable facts justifying the finding of exigent circumstances. *Ojeda*, 276 F.3d at 488.

9

Biggs argues that the only exigent circumstances that would have excused the warrantless seizure "was *possible* destruction of evidence." (Doc. 40 at 23) (emphasis in original).  However, the officer waiting beside the interior door of Biggs's hotel room did not hear sounds of flushing, so, according to Biggs, they had no reason to suspect that the occupants were destroying evidence.  (*Id.* at 24). Additionally, any evidence of drugs or contraband inside the hotel room was stale, since Davitt observed the drugs a week prior to her report to law enforcement, and Beartusk denied the presence of any drugs or contraband.  (*Id.*).

The Government maintains that both probable cause and exigent circumstances existed for the warrantless arrest of Biggs.  As to probable cause, the Government points to information from a "reliable informant," from Davitt, and from Beartusk that, when considered together, constituted probable cause.  (Doc. 44 at 7-8).  As to exigency, the Government argues that, based on Detective Hallam's training and experience, Biggs's quick retreat into his hotel room after seeing officers questioning Beartusk and searching her purse amounted to exigent circumstances justifying the arrest.  (*Id.* at 8).

The Court finds that, even before officers saw the Tahoe pull into the Econo Lodge, they had probable cause that room 119 contained drugs based on information from the informant, Davitt, and the hotel clerk.  Specifically, police had corroborated among the three sources that a black man named Robert Biggs

10

was staying in room 119 of the Econo Lodge, driving a white Tahoe, and had large

quantities of methamphetamine and fentanyl in the room he planned to sell through

Davitt and other women.  That information from Davitt about the presence of

drugs was a couple days old to a week old is not determinative because, according

to the Ninth Circuit, "[w]ith respect to drug trafficking, probable cause may

continue for several weeks, if not months, of the last reported instance of suspect

activity." *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986).

*See also United States v. Biswell*, 35 Fed. Appx. 577, 579 (9th Cir. 2002) ("As a

general rule of law, particularly in drug cases, the mere passage of time does not

negate probable cause … In one case, an affidavit indicating that the last suspected

drug activity occurred weeks before the issuance of the warrant was sufficient to

establish probable cause.").

Law enforcement's questioning of Beartusk and search of her purse

buttressed the officers' probable cause.  First, Beartusk was known to officers as a

methamphetamine user and involved in past drug investigations.  Second, she

confirmed knowing Biggs and driving his Tahoe.  Third, police found

methamphetamine, 200-300 fentanyl pills in small baggies, and drug distribution

paraphernalia.  That Biggs had a group of women selling for him, that Beartusk

possessed resale quantities of drugs and paraphernalia, and that Beartusk had

Biggs's vehicle in front of his hotel room further confirmed Biggs's presence in Billings and associated him with possession and distribution of drugs.

Beartusk's statement that she received the drugs in her purse from another person is not disqualifying. The totality of the circumstances outlined above provided officers with sufficient bases to infer that Beartusk was running drugs for Biggs. Further, Beartusk never stated that Biggs did not have drugs, regardless of where she obtained the ones in her purse. Rather, Beartusk told Detective Hallam she did not know if Biggs had drugs. Considering her statement alongside those of Davitt and the informant, police rightfully determined that there was a fair probability Biggs had large quantities of drugs in the hotel room. Thus, probable cause existed to search Biggs's hotel room.

As to the existence of exigent circumstances, the Court finds that officers reasonably believed that evidence or contraband would be imminently destroyed. Like in *McLaughlin*, Biggs's alarmed reaction to seeing the officers with Beartusk and his vehicle—quickly shutting the door and retreating inside—"made it likely" that Biggs would discover that he was under surveillance and lead him to destroy evidence. 525 F.2d at 521. That he may attempt to destroy contraband in order to evade prosecution is not speculation but rather a reasonable belief given the circumstances and the officers' training.

The fact that the officer stationed at the inside door of room 119 did not hear flushing is not dispositive.  If police had to wait until they had sensory confirmation of destruction of evidence, their attempts to interfere with such destruction would always be futile.

Acting with probable cause and under exigent circumstances, police validly seized Biggs without a warrant and did not violate his Fourth Amendment rights.

B.     *Waiver of Biggs's* Miranda *Rights*

Before proceeding with a custodial interrogation, law enforcement must advise a suspect of his *Miranda* rights: that he "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Dickerson v. United States*, 530 U.S. 428, 435 (2000) (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)).  To demonstrate a valid waiver of these rights, the Government has the burden to show: (1) the *Miranda* warning was given, (2) the suspect understood their rights, and (3) the suspect made an uncoerced statement.  *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).  Failure to satisfy these conditions is a violation of the Fifth Amendment.

Any waiver of a person's *Miranda* rights must be "voluntary, knowing and intelligent." *Miranda*, 384 U.S. at 479.  It "can be established even absent formal

or express statements of waiver[.]" *Berghuis*, 560 U.S. at 383. A "waiver of *Miranda* rights may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.'" *Id.* at 384 (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

Here, Biggs argues that Detective Hallam violated Biggs's Fifth Amendment rights because he never asked if Biggs wanted to waive his rights and speak to him without an attorney present. (Doc. 40 at 17). Thus, his waiver was neither knowing nor voluntary under *Miranda*, and the statements he made to Detective Hallam during his interrogation should be suppressed. (*Id.* at 18).

The Government maintains that Biggs waived his *Miranda* rights voluntarily, knowingly, and intelligently both times he was advised of his rights. Biggs's express affirmations of his understanding of his rights, followed by his responses to Detective Hallam's questions, demonstrate waiver. (Doc. 44 at 9-10).

The Court agrees with the Government. Biggs was read his rights, affirmatively stated he understood them, and then implicitly waived them by answering Detective Hallam's questions. In fact, Biggs demonstrated that he understood them by accurately reciting the meaning of the right to remain silent. Further, the law does not require, as Biggs contends, police to obtain an express statement from Biggs that he waived his rights. Biggs's responsiveness to

14

questioning was sufficient for an implied waiver.  Thus, Biggs waived his *Miranda*

rights, and his subsequent interrogation did not violate the Fifth Amendment.

> C.    *Biggs's Invocation of the Right to Counsel*

"In the context of invoking the *Miranda* right to counsel … a suspect must

do so 'unambiguously.'"  *Berghuis*, 560 U.S. at 381 (quoting *Davis v. United*

*States*, 512 U.S. 452, 459 (1994)).  "If an accused makes a statement concerning

the right to counsel 'that is ambiguous or equivocal' or makes no statement, the

police are not required to end the interrogation … or ask questions to clarify

whether the accused wants to invoke his or her *Miranda* rights."  *Id.* (quoting

*Davis*, 512 U.S. at 459, 461-62).  If the accused makes an unambiguous statement

and officers do not stop the interrogation, the officers have violated the accused's

Fifth Amendment rights.  *Miranda*, 384 U.S. at 469-73.  Requests for counsel are

to be "understood as ordinary people would understand them."  *Connecticut v.*

*Barrett*, 479 U.S. 523, 529 (1987).

Here, Biggs did not unambiguously ask for an attorney.  Biggs only asked

Detective Hallam, "what about an attorney? Would an attorney be better?"  An

ordinary person would interpret this as seeking advice on whether he should have

an attorney present, not as asking for one.  *Cf. Davis*, 512 U.S. at 462 (defendant

did not unambiguously invoke his right to an attorney when he asked, "[m]aybe I

should talk to a lawyer?") and *Sessoms v. Grounds*, 776 F.3d 615, 626 (9th Cir.

2015) (defendant unambiguously invoked his right to an attorney by asking, "There wouldn't be any possible way that I could have a—a lawyer present while we do this?"). Biggs does not explain how this statement was an unambiguous request under the law, nor point to any other statement that could be understood as such. Accordingly, Biggs did not invoke his right to an attorney, and Detective Hallam's questioning did not violate Biggs's Fifth Amendment rights.

D.     *Warrantless "Searches" of Biggs's Hotel Room*

"A warrantless search of a house is per se unreasonable and absent exigency or consent, warrantless entry into the home is impermissible under the Fourth Amendment." *United States v. Shaibu*, 920 F.2d 1423, 1425 (9th Cir. 2000) (internal citations omitted).  Again, this protection extends beyond the home to hotel rooms.  *Cormier*, 220 F.3d at 1108-09.

"Trespass alone does not qualify [as a search], but there must be conjoined with that … an attempt to find something or obtain information." *United States v. Jones*, 565 U.S. 400, 408 n.5 (2012).  *See also United States v. Knotts*, 460 U.S. 276, 286 (1983) (J. Brennan, concurring) (describing a search as "when the government … engage[s] in physical intrusion of a constitutionally protected area in order to obtain information[.]").

A protective sweep also is not a search requiring a warrant or individualized suspicion. *Maryland v. Buie*, 494 U.S. 325, 335 (1990).  "A 'protective sweep' is a quick and limited search of premises" that is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* at 327. Officers can conduct a protective sweep incident to an arrest in areas "immediately adjoining the place of arrest" to protect the safety of police officers or others. *Id.*

Biggs argues that the officers entered and searched the room four times without a warrant, in violation of the Fourth Amendment.  (Doc. 40 at 21).  The

17

Government disagrees, contending that officers did not perform any searches but rather protective sweeps. (Doc. 44 at 13). Officers had authority to do so under *Buie* because the "entries were done to promote a legitimate interest in ensuring the safety of everybody involved, and getting [McClusky] on her way as she was not a part of the investigation." (*Id.*). Additionally, McClusky gave the officers consent to get her possessions from the room, providing officers for authority to enter for that limited purpose. (*Id.*). Lastly, the Government contends that the entries are irrelevant to the motion because officers did not observe or seize anything that was included in the search warrant application. (*Id.* at 14).

Though Biggs does not specify what entries he challenges as searches, the Court assumes the four entries he references are when: (1) the third officer entered the room and removed McClusky, (2) Detective Hallam entered the room after McClusky was removed, (3) Detective Hallam retrieved McClusky's purse, and (4) Detective Hallam retrieved McClusky's drinks. The Court agrees with the Government that none of these entries violated the Fourth Amendment. The first two were valid protective sweeps because both were of the main living area of the hotel room, for a short period of time, and to secure the room. As to the first entry, the officer was in the room for less than 10 seconds, during which he can be heard telling McClusky to show her hands and exit the room. He then exited with her and handcuffed her on the ground. Though there is no footage of exactly what the

officer does while in the room, the brevity of his entry and his commands to

McClusky, followed immediately by their exit, are sufficient to show that he

sought to remove any other occupants from the room, not to search for evidence.

The second entry is equally brief and narrow in its scope. Detective Hallam

only looked on either side of the bed and quickly toward the bathroom. He does

not enter the bathroom or look in areas where a person could not plausibly have

been hiding. His entry lasted only 16 seconds. He had his gun drawn, indicating

he was searching for threats, not evidence. The fact that Detective Hallam does

not seize anything from the room affirms the Court's conclusion. Thus, his entry is

brief, only in areas adjacent to the arrest and where someone could have been

hiding, and without detours to search for evidence.

Because these entries were valid protective sweeps, neither violated Biggs

Fourth Amendment rights.

The third and fourth entries were not searches, and therefore protected by the

Fourth Amendment, because, though Detective Hallam entered the room, he did

not do so with the intent to find evidence or information. Both were effectuated to

gather items owned by McClusky—first, her purse, then, her drinks—who police

detained briefly when they cleared the room and checked her for warrants.

Further, the entries were brief, and police seized no evidence. Accordingly, these

entries were not searches that implicated Biggs's Fourth Amendment rights.

Because they were not searches, the Court will not address the Government's consent argument.

Even if the officers' entries into Biggs's hotel room were unconstitutional searches, the officers did not seize any evidence or gather any information that they included in the search warrant application that the Court could suppress. Thus, Biggs's Fourth Amendment rights were not violated.

E.      *Sufficiency of the Search Warrant*

Where a search is conducted by state law enforcement pursuant to a state warrant and is not otherwise "federal in character," the warrant need only conform to the requirements of the U.S. Constitution, rather than to the procedural requirements of Federal Rule of Criminal Procedure 41. *See United States v. Bookout*, 810 F.2d 965, 967 (10th Cir. 1987). Under the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

As stated, to satisfy the probable cause requirement, the totality of the circumstances must show that there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Needham*, 718 F.3d at 1194. The Government bears the burden of showing the specific and articulable facts justifying the finding of exigent circumstances. *Ojeda*, 276 F.3d at 488.

Biggs does not argue that the search warrant lacks probable cause as written but rather that it would lack probable cause if Biggs's statements were suppressed. (Doc. 40 at 26). The Government asserts that even if the Court finds the officers violated Biggs's constitutional rights and suppressed Biggs's statements about the drugs in his room, the search warrant still would be supported by probable cause and the drugs would not need to be suppressed. (Doc. 44 at 14-16).

The Court agrees with the Government that the warrant is supported by probable cause even if the allegedly illegally obtained evidence is suppressed because officers developed probable cause before they contacted Biggs. As discussed, officers developed probable cause, at earliest, when the Tahoe parked in front of room 119 and, at the latest, after questioning Beartusk and searching her purse. The evidence Biggs seeks to suppress was collected after the search of Beartusk's purse. Thus, even considering the search warrant application without the suppressed information, the Court finds it is still supported by probable cause.

Biggs argues that the search warrant application also contains "serious omissions [and] false statements[.]" The only omissions or false statements that Biggs notes are that Beartusk stated she obtained the drugs in her purse from a third party, that Beartusk denied seeing Biggs with a gun, and that officers falsely stated they secured, but did not search, the room pending the warrant. (Doc. 40 at 13). The Court already has concluded that the first omitted statement is not

21

dispositive, and that the alleged false statement misconstrues applicable law on what constitutes a search. Additionally, officers' statement that they "secured" the room was not false even though, as Defendant argued at the hearing, law enforcement were moving in and out of the room. Detective Hallam and Officer Flammang testified that "securing" a room means that no one *other than law enforcement* or any item is able to enter or leave the room. The body camera footage is clear that the only people who entered and left the room were law enforcement, and Biggs and McClusky with a law enforcement escort. The items that left the room were retrieved by Detective Hallam for McClusky upon her request. Because no person entered or exited the room without law enforcement authorization, the room was secured and the statement was not false.

As to the second statement, the Court finds that it is not relevant to the search warrant application, since the search warrant was based on suspicion of criminal possession with intent to distribute, not any firearm crimes. (*See* Doc. 42-1 at 6).

Accordingly, the search warrant was supported by probable cause even without the evidence Biggs seeks to suppress. The search of Biggs's room pursuant to the warrant therefore did not violate the Fourth Amendment.

## III.   Conclusion

IT IS SO ORDERED that Robert Earl Biggs's Motion to Suppress (Doc. 39)

is DENIED.

DATED this _21st_ day of August, 2023.

SUSAN P. WATTERS
United States District Judge